UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT WILLIAMS, <br>     Plaintiff, <br><br> v. <br><br> MICHAEL NUTTER; LOUIS GIORLA; <br> JOHN DELANEY; and <br> CORIZON MEDICAL COMPANY, <br>     Defendants. | No. 2:17-cv-00563 |

**O P I N I O N**
PPS Defendants' Motion for Summary Judgment, ECF No. 46 – Granted
Defendant Corizon's Motion for Summary Judgment, ECF No. 47 – Granted
Plaintiff's Motion to Deny Summary Judgment, ECF No. 49 - Denied

**Joseph F. Leeson, Jr.**                                                         **November 12, 2019**
**United States District Judge**

**I.    INTRODUCTION**

Plaintiff Robert Williams alleges that during his term of incarceration at the Curran-Fromhold Correctional Facility ("CFCF") in Philadelphia, Pennsylvania,[1] he was triple-celled[2] in violation of his constitutional rights, received inadequate medical care after sustaining injuries in a fall from the top bunk bed, and was retaliated against for filling grievances regarding the same. Named as Defendants are Michael Nutter, formerly the Mayor of the City of Philadelphia; Louis Giorla, formerly the Commissioner of the Philadelphia Prison System ("PPS"); John Delaney, formerly the Warden of CFCF;[3] and Corizon Medical Services, a private company contracted to

---

[1]     Williams is currently incarcerated at the State Correctional Institute in Huntingdon, Pennsylvania.
[2]     Triple-celling occurs when three or more inmates are placed in a cell designed to house two. Triple-celling has been used as a method to deal with prison over-crowding.
[3]     Nutter, Giorla, and Delaney are collectively referred to herein as "PPS Defendants."

provide medical care for inmates. For the reasons discussed below, there is no evidence showing that any Defendant violated Williams's constitutional rights and summary judgment is granted in favor of all Defendants on all claims.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A disputed fact is "material" if proof of its existence or nonexistence might affect the outcome of the case under applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 257.

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The party opposing the motion must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

## III. PROCEDURAL HISTORY

Williams's initial complaint was dismissed for failure to state a claim, with leave to amend. *See* Order dated March 20, 2017, ECF No. 4. Williams thereafter filed an amended complaint, *see* Am. Compl., ECF No. 9, which all Defendants moved to dismiss. However, the proceedings were stayed when the case was referred to the Prisoner Civil Rights Panel to attempt to aid Williams in finding an attorney. *See* ECF Nos. 12, 16, 21. When no attorney agreed to represent Williams, the stay was lifted and the case proceeded to discovery. PPS Defendants and Corizon have since filed motions for summary judgment. *See* ECF Nos. 46-51.

## IV. FACTUAL BACKGROUND

The Amended Complaint asserts three counts. *See* Am. Compl. First, Williams alleges that PPS Defendants breached their duty to protect him by triple-celling him in unsanitary living conditions, and subjected him to constant lock-downs. *See id.* Second, Williams alleges that Corizon was deliberately indifferent to his medical needs by delaying treatment for his rib injury until the evening after his early morning fall and then providing only pain relief but no diagnostic testing.[4] *See id.* Third, Williams alleges that he was subjected to retaliatory transfers within the PPS for filing grievances. *See id.* He also alleges that he filed grievances but received no response, and that Delaney and Giorla implemented a policy to dissuade inmates from filing grievances by ordering CFCF guards to confiscate and destroy copies of all grievances and complaints. *See id.*

Williams was incarcerated in the PPS from February 2015 to July 12, 2016. *See* Pl.'s Dep. 8:8-18, ECF No. 46-2. During his incarceration, Williams never saw or had any

---

[4] Williams admitted that none of the PPS Defendants were personally involved in Williams's medical treatment. *See* Pl.'s Dep. 30:1-11.

interactions with Nutter or Giorla. *See* Pl.'s Dep. 10:5 – 11:5. Williams did see Delaney walk through the prison, but testified that Delaney did not "even walk on the blocks to see how the blocks are running [he] just walk[ed] around the bubble and le[ft] right out." *See* Pl.'s Dep. 10:5 – 11:20. Williams never had any personal interaction with Delaney. *See id.*

There is little or no evidence in the record regarding how long Williams was housed in each type of detention and/or cell. In fact, the Amended Complaint only refers to Williams being triple-celled between February 2015 and June 2015. *See* Am. Compl. ¶¶ 9-23, 41-42. Over the course of those four months, Williams was in a three-man cell for approximately one month until he was transferred to a four-man cell, allegedly in retaliation for filing grievances. *See id.* ¶¶ 9-13, 16-17. Two months later, Williams was transferred to the Detention Center, again allegedly in retaliation for filing grievances. *See id.* ¶ 41. After a one-day stay in medical a few weeks later, Williams was transferred back on June 4, 2015, to the same four-man cell. *See id.* ¶¶ 42-43. Although there are no other details about the housing placements in the record, in light of Williams's pro se status,[5] the Court assumes that when Williams testified about his treatment in the PPS, his complaints pertain to the entire period of incarceration: February 2015 to July 2016.

There is also a lack of evidence regarding Williams's living conditions. Aside from Williams's statement that he was subjected to "constant lock-downs," *see* Am. Compl. ¶ 19, he offers no details about the length or frequency of such lock-downs. It is clear from the record, however, that "constant" does not literally mean every day, as Williams testified about leaving his cell for breakfast and for lunch on the day of his fall in June 2015. *See* Pl.'s Dep. 17:10-14,

---

[5] Although the court must construe a pro se complaint liberally, a pro se litigant opposing summary judgment still faces "the formidable task of avoiding summary judgment by producing evidence 'such that a reasonable jury could return a verdict for [him].'" *Zilich v. Lucht*, 981 F.2d 694, 696 (3d Cir. 1992) (quoting *Anderson*, 477 U.S. at 242).

4
111219

21:3-17.  Similarly, although Williams states that he was placed in a "boat" to sleep on the floor, *see* Am. Compl. ¶ 34, he slept in a bunk bed on the day of his fall, *see* Pl.'s Dep. 14:25 – 16:9.

On the day of his fall in June 2015,[6] according to the undisputed facts, Williams rolled off the top bunk in the early morning hours.  *See* Pl.'s Dep. 16:7-12.  He testified that he repeatedly pushed the call button but it "didn't work" so, in an effort to avoid waking his cellmates, Williams climbed back into bed and waited until the next morning.  *See id.* at 16:19-25.  A few hours later when all inmates were let out for breakfast, Williams first informed one of the correctional officers that he was injured, and that officer promptly called for medical.  *See id.* at 16:20 – 18:9.  Williams went to medical, but could not be seen without an incident report.  *See id.* at 16:13 – 17:24, 19:1 – 23:15. After having lunch, Williams returned to his cell to wait.  *See id.* at 21:3-14.  While waiting, he did not take pain medication or make any efforts to obtain the same.  *See id.* at 23:2-12.  Williams returned to medical that evening, at which time Dr. DiLauro examined him, gave him a shot of morphine, which helped his pain, and ordered x-rays.  *See id.* at 23:13 – 24: 22; DiLauro Progress Notes 6/17/2015, ECF No. 48-3 (listing Williams's vitals at 8:00 p.m.).  Dr. DiLauro, who explained to Williams why it was not appropriate to wrap his ribs, also prescribed a dose of pain medication for that night, which was administered.  *See id.*; Marinho Note 06/17/2015, ECF No. 48-3.

In addition to these undisputed facts, there is also disputed evidence regarding Williams's injuries and treatment following his fall from the top bunk bed.  Specifically, Williams testified that Dr. DiLauro informed him that he had three fractured ribs, but that he did not get x-rays until

---

[6] There is some discrepancy as to whether Williams fell on June 17, 2015, or June 19, 2015, but for the reasons discussed herein, this difference is not "material."  *Cf.* Pl.'s Dep. 25:2-8, *with* DiLauro Progress Notes, ECF No. 48-3.

two months later[7] and he continued to have pain. *See* Pl.'s Dep. at 25:1 – 26:12. However, Dr. DiLauro's Progress Notes dated June 17, 2015, describing Williams's fall and medical treatment, state that Williams was diagnosed with "very bad contusions of ribs," but that it was "less likely fracture." *See* DiLauro Progress Notes. Also, medical records from Bustleton Radiology Associates, Ltd. show that x-rays were performed on June 19, 2015, two days after the fall, and revealed no evidence of a fracture. *See* ECF No. 48-3. Williams was treated again by medical on June 22, 2015, and June 25, 2015. The Progress Notes of PA Karen McKinney dated June 25, 2015, indicate that the x-rays were negative for rib fractures. *See* McKinney Progress Notes, ECF No. 48-3. The Progress Notes of PA Helen Sarskaya dated July 21, 2015, also mention the negative x-rays. *See* Sarskaya Progress Notes, ECF No. 48-3. Between June 2015 and May 2016, Williams received medical attention on twenty separates dates,[8] never more than two months apart. *See* Medical Records, ECF No. 48-3. However, the rib injury was not mentioned in the records beyond the second month of treatment.

V. **ANALYSIS**

  A. **The evidence does not support a constitutional claim for triple-celling against any Defendant.[9]**

---

[7] In August 2015, Williams was treated by medical after experiencing shortness of breath. *See* Pl.'s Dep. at 28:23 – 29:20; Progress Notes 08/30/2015 and 08/31/2015, ECF No. 48-3.

[8] Williams received medical treatment at the prison on June 22, June 25, July 21, August 30, August 31, October 9, October 19, October 21, October 23, November 16, November 19, December 21, and December 22, 2015, and on February 7, February 8, February 19, February 22, March 17, March 23, and May 12, 2016.

[9] There is no suggestion or evidence that Corizon had any involvement with the triple-celling of Williams. Thus, this section is limited to a discussion of the PPS Defendants and any related *Monell* claim. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) (discussing the circumstances under which a municipality and other local government unit may be liable under § 1983).

Assuming for the sake of argument that the conditions of Williams's triple-celling rose to the level of a constitutional violation,[10] there is no evidence that any PPS Defendant was personally involved.

A "defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior." *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity." *Id.* at 1207-08. Additionally, a supervisory defendant may be liable under 42 U.S.C. § 1983 if the defendant, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the plaintiff's] constitutional harm." *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989).

### 1. Knowledge and Acquiescence Theory

"Although a court can infer that a defendant had contemporaneous knowledge of wrongful conduct from the circumstances surrounding a case, the knowledge must be actual, not constructive." *Chavarriaga v. New Jersey Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015).

---

[10] *But see Dan v. Curran-Fromhold Corr. Facility*, 2018 U.S. Dist. LEXIS 81107, at *4-5 (E.D. Pa. May 14, 2018) (finding that the allegations - the plaintiff was confined with two other inmates in 8' x 6' cells for approximately nineteen months, there was a bed on the floor next to a toilet, he experienced back pain, and when placed in solitary he was unable to take a shower or to leave his cell for an entire day- failed to state an Eighth Amendment claim for overcrowding); *Mohorcic v. Hogue*, No. 11-575, 2013 U.S. Dist. LEXIS 165282, at *11-12 (W.D. Pa. Nov. 21, 2013) (granting the defendants' motion for summary judgment on the broader Fourteenth Amendment triple-celling claim because despite the splashing of urine on his bedding, the longest period of time the plaintiff spent assigned to a cot was approximately four months and the record was silent as to how much time he had to spend in his cell).

Actual knowledge cannot be derived solely from grievances filed with the defendant's office. *See Rode*, 845 F.2d at 1208.

There is no evidence that any Defendant participated or had actual knowledge of the conditions Williams experienced. Williams testified that he had never personally interacted with, or had seen, either Nutter or Giorla. In fact, Williams testified that he did not even know who Giorla is. *See* Pl.'s Dep. 10:5 – 11:5. Although Williams testified that Delaney walked through the prison, there is no evidence that Delaney actually observed the living conditions or spoke directly with any inmate. *Accord Lopez v. City of Phila.*, No. 13-6571, 2017 U.S. Dist. LEXIS 103270, at *12-13 (E.D. Pa. July 5, 2017) (concluding that the plaintiff alleged sufficient facts to show the warden's personal involvement in the triple-celling violation because the plaintiff spoke personally with the warden while the warden made rounds through the prison).

### 2. Deliberate Indifference Theory

When relying on policy or custom under the second theory of liability, the plaintiff must:

> (1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure.

*Brown v. Muhlenberg Twp.*, 269 F.3d 205, 216 (3d Cir. 2001). "[P]roof of the mere existence of an unlawful policy or custom is not enough to maintain a § 1983 action." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990). A plaintiff must also "specifically identify the acts or omissions of the supervisors that show deliberate indifference, and suggest to the Court a relationship between the 'identified deficiency' of a policy or custom and the injury suffered." *Cain v. Nutter*, No. 16-1614, 2016 U.S. Dist. LEXIS 166071, at *7 (E.D. Pa. Nov. 30, 2016).

Although Williams alleges that there was a custom and practice at PPS of triple-celling inmates in unsafe and unsanitary conditions, there is no specific evidence in the record to support such a claim. As mentioned previously, Williams does not provide any facts regarding the length of his housing placements or of the lock-downs. Additionally, although the inmates in the same cell as Williams would necessarily have been subject to similar conditions, there is no evidence or even specific allegations regarding whether such practices were widespread and permanent, or, if they were, how long they had been occurring. *See Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 250 (3d Cir. 2007) (holding that a plaintiff "may establish that a course of conduct constitutes a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanent and well settled' that they operate as law" (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978))).

There is also no evidence that Williams suffered an injury as a result of any custom or practice of triple-celling. *See Bielevicz*, 915 F.2d at 850 ("[P]roof of the mere existence of an unlawful policy or custom is not enough to maintain a § 1983 action. A plaintiff bears the additional burden of proving that the municipal practice was the proximate cause of the injuries suffered."); *Losch v. Parkesburg*, 736 F.2d 903, 910 (3d Cir. 1984) (explaining that where the constitutional violation is based on a policy, custom, or practice, there must be a "causal link between execution of the policy and the injury suffered"). Williams's rib injury occurred when he rolled out of the top bunk and is unrelated to the triple-celling conditions.[11]

---

[11] To the extent Williams's failure to protect count is based on his assignment to a top bunk with no guard rails, the evidence is also insufficient to survive summary judgment. Not only is there no evidence that any Defendant was personally involved with assigning Williams to a top bunk, but there is no evidence that Williams should not have been assigned to a top bunk, whether based on his age, medical condition, or a history of falling. *See Veanus v. Northampton Cnty. Prison*, 238 F. App'x 753, 754-55 (3d Cir. 2007) (granting summary judgment in the prison's favor regarding the bunk assignment claim because there was no evidence of a policy

9
111219

Summary judgment is therefore granted in favor of the individual PPS Defendants on Williams's triple-celling claims.[12] *See Goode v. Nutter*, No. 11-6420, 2017 U.S. Dist. LEXIS 125832, at *11 (E.D. Pa. Aug. 8, 2017) (dismissing the triple-celling claims against the mayor, the commissioner, and the warden because the plaintiff "did not articulate any specific conduct by the Defendants which led to the conditions of which he complained). For the same reasons, summary judgment is also granted as to Williams's *Monell* claim, if any. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 n.10 (1986) (holding that a "§ 1983 plaintiff [] may be able to recover from a municipality without adducing evidence of an affirmative decision by policymakers **if** able to prove that the challenged action was pursuant to a state 'custom or usage'" (emphasis added)).

---

for handling bunk assignments, nor any evidence that the need for such a policy "was so obvious and so likely to lead to the violation of constitutional rights that the policy maker's failure to respond amounts to deliberate indifference" because the plaintiff did not present evidence, "for example, that any other prisoner had been denied a medically-required bunk assignment, had fallen from a top bunk, or had ever complained about this issue"). Further, a prison's failure to install safety rails on bunk beds intended to be used solely by adults does not rise to the level of a constitutional violation. *See Walker v. Walsh*, No. 3:11-CV-1750, 2012 U.S. Dist. LEXIS 12200, at *14 (M.D. Pa. Feb. 1, 2012).

[12] The individual Defendants would also be entitled to qualified immunity with respect to the triple-celling claims because, for the reasons previously stated, their conduct did not violate a constitutional right and, moreover, any such right was not clearly established. *See Saucier v. Katz*, 533 U.S. 194, 199 (2001) (discussing the two-part test the courts apply to determine whether an official is entitled to qualified immunity). Pretrial detainees do not have a constitutional right to be free from triple-celling. *See Hubbard v. Taylor*, 538 F.3d 229, 236 (3d Cir. 2008). Because the determination as to whether triple-celling rises to the level of a constitutional violation is "very fact-specific and require[s] close consideration of all the circumstances," a reasonable official under the facts of the instant action might not appreciate the differences between the circumstances giving rise to a constitutional violation. *See Duran v. Merline*, 923 F. Supp. 2d 702, 718-19 (D.N.J. 2013). "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (internal quotations omitted). "This accommodation for reasonable error exists because 'officials should not err always on the side of caution' because they fear being sued." *Id.* (internal quotations omitted).

**B. There is no evidence that any Defendant was deliberately indifferent to Williams's serious medical needs.[13]**

"Pretrial detainees may assert Section 1983 claims for inadequate medical care under the Fourteenth Amendment's substantive due process clause." *Moore v. Luffey*, 767 F. App'x 335, 340 (3d Cir. 2019) (citing *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003)). Such claims are evaluated "under the same standard used to evaluate similar claims brought under the Eighth Amendment." *Id.* This standard has two elements: "the plaintiff 'must make (1) a subjective showing that the defendants were deliberately indifferent to [his or her] medical needs and (2) an objective showing that those needs were serious.'" *Id.* (quoting *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017)). A medical need is "serious" if it has been diagnosed by a physician as requiring treatment or is so obvious that a lay person would easily recognize the need for medical attention. *See Monmouth Cnty. Corr. Inst.'l Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (citing *Estelle v. Gamble*, 429 U.S. 97 (1976)).

"[T]here is a critical distinction between cases where the complaint alleges a complete denial of medical care and those alleging inadequate medical treatment." *Pearson*, 850 F.3d at 526 (internal quotations omitted). Neither mere allegations of malpractice nor mere disagreements as to the proper medical treatment support an Eighth Amendment violation. *See Lanzaro*, 834 F.2d at 346. "Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106.

---

[13] To the extent Williams may have attempted to assert a claim of medical negligence, the claim does not survive summary judgment because he has not offered any evidence of causation. *See Mitzelfelt v. Kamrin*, 584 A.2d 888, 892 (Pa. 1990) (concluding that in a medical malpractice case, the plaintiff "is also required to present an expert witness who will testify, to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered").

As to the PPS Defendants, there is no evidence that any were personally involved in Williams's medical care. *See Peters v. Brown*, No. 18-2796, 2019 U.S. App. LEXIS 32490, at *8-9 (3d Cir. Oct. 30, 2019) (affirming the entry of summary judgment because the prison officials were not personally involved in the plaintiff's medical care (citing *Rode*, 845 F.2d at 1207); *Batts v. Giorla*, 550 F. App'x 110, 112-13 (3d Cir. 2013) (affirming the district court's decision to grant summary judgment to Giorla, the Commissioner of PPS, because the plaintiff did not claim that Giorla had a role in providing or determining the medical treatment he received). Moreover, Williams did receive medical treatment from medical professionals. *See Peters*, 2019 U.S. App. LEXIS 32490, at *8-9 (holding that "a nonmedical prison official is not deliberately indifferent to a pretrial detainee's serious medical needs when the pretrial detainee was recently under the care of medical experts and the official does not have a reason to believe or actual knowledge that those medical experts or their assistants mistreated or failed to treat the pretrial detainee" (citing *Pearson*, 850 F.3d at 543)); *McCluskey v. Vincent*, 505 F. App'x 199, 203 (3d Cir. 2012) (holding that "non-physician defendants cannot be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor" (internal citations omitted)). Accordingly, summary judgment is granted in favor of the PPS Defendants.

Summary judgment is also granted in favor of Corizon because Williams's complaint that medical failed to promptly[14] obtain diagnostic testing for his rib fractures is nothing more than a mere disagreement with the care provided, which does not support an Eighth Amendment claim of deliberate indifference. *See Lanzaro*, 834 F.2d at 346 (holding that mere allegations of

---

[14] For purposes of this Opinion, the Court accepts Williams's allegations of a two-month delay in determining whether he has offered sufficient evidence to survive summary judgment.

malpractice and/or mere disagreement as to the proper medical treatment do not support a deliberate indifference claim under the Eighth Amendment). "[T]he question whether an X-ray - or additional diagnostic techniques or forms of treatment - is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment." *Estelle*, 429 U.S. at 107. Williams was regularly seen by medical: six times in the first two months after his fall, and he has offered no evidence that additional and/or different treatment was medically required. *See Carson v. Ahsan*, No. 15-2237 (BRM), 2019 U.S. Dist. LEXIS 88961, at *10-12 (D.N.J. May 24, 2019) (granting summary judgment in favor of the prison doctor because the prisoner received frequent treatment for his foot injury and no further treatment was necessary). The evidence, therefore, does not show that Corizon acted with deliberate indifference. *See Rowland v. Duran*, 538 F. App'x 146, 146-47 (3d Cir. 2013) (concluding that the prisoner's complaint that he did not receive an x-ray[15] until two months after he injured his foot in a fall did not rise to the level of deliberate indifference); *Ruff v. Health Care Adm'r*, 441 F. App'x 843, 846 (3d Cir. 2011) (stating that while it was unfortunate the prisoner's fractured rib went undisclosed for two years, the physician's medical choice to not order an x-ray at the time of the injury "at most exhibits negligence, which is insufficient to state a cognizable Eighth Amendment claim").

      There is also insufficient evidence to show that Williams had a "serious medical need." Although Williams experienced pain from the fall, he was able to climb back into bed and wait for several hours until a correctional officer came by at breakfast time to hear his medical request. When Williams was not immediately treated by medical because he did not have an incident report, Williams went to lunch and then returned to his cell to wait, but did not take, or

---

[15] The x-ray revealed that the prisoner's foot was broken.

try to obtain, any pain medication. This evidence does not show that Williams's injury rose to the level of a "serious medical need." *See Lanzaro*, 834 F.2d at 347 (holding that the "seriousness of an inmate's medical need may also be determined by reference to the effect of denying the particular treatment" and citing examples such as delay causing "unnecessary and wanton infliction of pain" and/or "a life-long handicap or permanent loss"). Williams's claim of deliberate indifference because he was not immediately treated when first seen by medical, therefore, also fails to rise to the level of a constitutional violation. *See Mesadieu v. Union Cnty.*, No. 17-9014, 2019 U.S. Dist. LEXIS 76287, at *10-11 (D.N.J. May 6, 2019) (concluding that the inmate's bruised ribs and severe leg pain were not sufficiently "serious" for purposes of establishing a constitutional claim for deliberate indifference to medical needs); *Dzwonczyk v. Syracuse City Police Dep't*, 710 F. Supp. 2d 248, 268 (N.D.N.Y. 2008) (determining that the plaintiff's injuries (swollen face, two black eyes, bruised ribs, and a bruised back) may have caused great pain at the time of infliction, but were not "serious" in constitutional terms).

Finally, even if the medical staff were deliberately indifferent to a serious medical need, in order to hold Corizon liable, Williams must meet the standard of liability set forth in *Monell*, as discussed above. But, Williams offers no evidence, nor does he even allege, that a policy, custom, or practice of Corizon caused him constitutional harm. *See Talbert v. Corizon Inc.*, 711 F. App'x 668, 670 (3d Cir. 2017) (agreeing with the district court that the inmate, who alleged prison medical staff were deliberately indifferent for not ordering x-rays to test for tuberculosis, "failed to state a claim against Corizon pursuant to *Monell* [] because he failed to allege facts plausibly demonstrating the existence of a relevant custom or policy of Corizon"). Nor does Williams offer any evidence linking any such policy, custom, or practice to the alleged constitutional violation, or showing how a final policymaker is responsible. *See Beatty v.*

*Person*, No. 19-1720, 2019 U.S. App. LEXIS 31681, at *7-8 (7th Cir. Oct. 23, 2019) (granting summary judgment in favor of Corizon because the inmate failed to point to a policy that caused a constitutional injury or any evidence that a policymaker at Corizon required different care).

For all these reasons, summary judgment is granted in favor of all Defendants on Williams's second count.

### C. There is no evidence to support a retaliation claim.[16]

Williams's third count, alleging retaliatory transfers[17] because Williams filed grievances,

---

[16] Th facts underlying this claim involve the PPS Defendants only and this section is therefore limited to a discussion of the evidence against them. To the extent Williams intended to also bring this claim against Corizon, the evidence is woefully insufficient to survive summary judgment. *See Talbert*, 711 F. App'x at 670 (affirming the dismissal of the inmate's retaliation claim against Corizon for keeping him in medical lock-in because there were no allegations of personal involvement or any facts suggesting a policy, practice, or custom of Corizon).

[17] Williams also alleges in the Amended Complaint that Delaney and Giorla implemented a policy to dissuade inmates from filing grievances by ordering prison guards to confiscate and destroy copies of all grievances and complaints. However, aside from this broad statement and Williams's comments in response to the summary judgment motions that his grievances were lost, Williams offers no evidence to support these accusations and his deposition testimony did not delve into this claim. *See Royster v. Beard*, 308 F. App'x 576, 579 (3d Cir. 2009) (granting summary judgment in the defendants' favor because the plaintiff could not identify a specific grievance he believed motivated the alleged retaliatory conduct, failed to demonstrate any causal connection between his grievances and the confiscation of his property, could not name which specific items were confiscated, and presented no evidence that the defendants were directly involved in confiscating the materials). Moreover, "[p]risoners do not have a constitutional right to prison grievance procedures, [and the] alleged obstruction or misapplication of these procedures is not independently actionable." *Freeman*, 447 F. App'x at 387 (internal citation omitted). Williams's allegations regarding the confiscation of grievances and related property (such as "notes documenting violations") is also not actionable under the Due Process Clause because the "[d]eprivation of inmate property by prison officials does not state a cognizable due process claim if the prisoner has an adequate post-deprivation state remedy." *See Freeman*, 447 F. App'x at 388 (holding that a state tort action is an adequate remedy available to a prisoner alleging that his property was confiscated and destroyed); *See Torres v. Fauver*, 292 F.3d 141, 150 (3d Cir. 2002) (holding that an inmate's "transfer to 'less amenable and more restrictive quarters' did not implicate a liberty interest protected by the Due Process Clause'" (quoting *Hewitt v. Helms*, 459 U.S. 460, 468 (1983))).

is analyzed under the First Amendment.[18] "To establish a claim of retaliation under the First Amendment, [the plaintiff] must show that (1) the conduct in which he was engaged was constitutionally protected; (2) he suffered adverse action at the hands of prison officials; and (3) his constitutionally protected conduct was a substantial or motivating factor in the decision to take the adverse action." *Freeman v. Dep't of Corr.*, 447 F. App'x 385, 387-88 (3d Cir. 2011) (citing *Rauser v. Horn*, 241 F.3d 330, 333-34 (3d Cir. 2001)). "To make out a viable retaliation claim, the alleged retaliatory action must be sufficiently adverse to deter a person of ordinary firmness from exercising his First Amendment rights." *Bullock v. Buck*, 611 F. App'x 744, 747 (3d Cir. 2015) (internal citations and quotations omitted).

Filing grievances is constitutionally protected conduct. *See Bullock*, 611 F. App'x at 747. However, the evidence does not show that Williams suffered an "adverse action." "An inmate does not have a right to be placed in the cell of his choice." *Sheehan v. Beyer*, 51 F.3d 1170, 1174 (3d Cir. 1995) (citing *Hewitt v. Helms*, 459 U.S. 460, 468 (1983)). Thus, a transfer from one three-man cell to a different three-man cell would not deter a person of ordinary firmness from exercising his First Amendment rights. *See Griffin v. Williams*, No. 1:CV-10-02472, 2011 U.S. Dist. LEXIS 88524, at *18 (M.D. Pa. Aug. 10, 2011) (concluding that transferring an inmate from one two-bunk cell to another two-bunk cell in the same cell block is not sufficient to deter a reasonable person from exercising his constitutional rights). Nor did it deter Williams from continuing to file grievances. Williams's transfer to a four-man cell a month later was also not sufficiently adverse. *See Smith v. Hayman*, 489 F. App'x 544, 548 (3d Cir. 2012) (affirming the entry of summary judgment on the inmate's retaliation claim because apart from temporal

---

[18]     *See Torres v. Fauver*, 292 F.3d 141, 150 (3d Cir. 2002) (holding that an inmate's "transfer to 'less amenable and more restrictive quarters' did not implicate a liberty interest protected by the Due Process Clause'" (quoting *Hewitt v. Helms*, 459 U.S. 460, 468 (1983))).

proximity, the plaintiff failed to provide any evidence probative of retaliation, nor did he show that transfer from a single cell to a double-occupancy cell was such that a person of ordinary firmness would have been deterred from exercising his constitutional rights).

Moreover, there is no evidence that the transfers were retaliatory. Although inmates frequently invite courts to infer retaliatory motives to cell assignment and other prison policies, such invitations are rarely embraced. *See Sears v. Foulds*, No. 1:16-CV-2341, 2019 U.S. Dist. LEXIS 18445, at *12-13 (M.D. Pa. Feb. 4, 2019). Williams was incarcerated in a three-man cell from the first day he arrived at PPS and aside from having allegedly filed numerous grievances during the first four months of his confinement, during which time he was also transferred, there is no evidence that the grievances were a substantial or motivating factor in the transfer decisions. There is also no evidence in the record as to who made the transfer decisions, or whether those individuals were policymakers or even knew Williams had filed a grievance. *See Tinsley v. Giorla*, 369 F. App'x 378, 381 (3d Cir. 2010) (concluding that the plaintiff did not provide evidence suggesting that the alleged retaliatory acts were motivated by his complaints because although he claimed that he was transferred for having filed grievances against certain defendants, the plaintiff failed to identify the official who actually transferred him, who had the authority to transfer him, or that such person was aware of the grievances). There is also no evidence of personal involvement by any of the named Defendants or of a policy, custom, or practice. *See Solan v. Ranck*, 326 F. App'x 97, 101 (3d Cir. 2009) (determining that the plaintiff's bare allegation the defendant probably had something to do with his transfer based on her supervisory position failed to set forth facts indicating that the defendant personally directed or knew of and acquiesced in his transfer for retaliatory reasons).

Summary judgment is therefore granted in favor of all Defendants on this claim.

## VI. CONCLUSION

Summary judgment is granted in favor of all Defendants on all three counts. As to the first count, the evidence regarding the circumstances of Williams's triple-celling do not support a constitutional violation. There is also no evidence that the PPS Defendants were personally involved in the triple-celling or of any custom, policy, or practice regarding the same. On the second count, there is no evidence that the PPS Defendants were involved with Williams's medical care. There is also no evidence that a policy, custom, or practice of Corizon caused him constitutional harm. Further, Williams's complaints reflect his mere disagreement with the treatment provided by medical staff and do not rise to the level of deliberate indifference, and he has failed to offer expert evidence that the treatment provided violated the standard of care. Finally, there is no evidence to support the only actionable claim (retaliatory transfer) in the third count. Williams does not offer evidence showing that the transfers were sufficiently "adverse," that his filing of grievances was a substantial or motivating factor in the decisions to transfer him, or of any connection, whether by personal involvement or policy, practice, or custom, to any Defendant. Defendants' Motions for Summary Judgment are granted.

A separate order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge